We will hear argument next in the final case for the morning, Alliance for the Wild Rockies v. Kimbell. Counsel, you may now proceed. Thank you. Good morning. My name is Rebecca Smith, and I represent the appellants in this case, Alliance for the Wild Rockies, Native Ecosystems Council, and the Wild West Institute. This is 0636013, Alliance for the Wild Rockies v. Kimbell. I'd like to address four issues today. The first issue that I'd like to address is that the Forest Service is not ensuring the viability of wildlife species on the Helena National Forest. The second issue that I'd like to address is that the Forest Service failed to discuss and fail to disclose the findings of its own scientists in the five-year review of the Helena National Forest Plan. The third issue that I'd like to discuss is that the Forest Service has failed to conduct a NEPA analysis for the divide landscape analysis. And the fourth and final issue that I'd like to discuss today is that the Forest Service did not apply the best available science standard to this project. Regarding the first issue, the Forest Service has failed to demonstrate that it is ensuring the viability of wildlife species in the Helena National Forest because it has failed to monitor the populations of indicator species on that forest. That's a requirement that's found in the forest plan itself and which the Forest Service has failed to do. Counsel, what is the standard of review that applies to our review of this first argument? Your Honor, the standard of review is the arbitrary and capricious standard of review under the Administrative Procedures Act. And under that standard of review ---- It's a fairly high hurdle, right? Well, it is fairly high, but it does require that the agency's determination is not only supported in the record by substantial evidence, but that also that the agency has not failed to address an important factor or that it hasn't rendered a conclusion that runs contrary to the factual findings in the record before it. And so that is one of the main issues in this case is that there isn't substantial evidence in the record that demonstrates the Forest Service is ensuring viable populations of wildlife species on the Helena National Forest. This issue is completely controlled by this Court's opinion in Lands Council v. Powell and Idaho Sporting Congress v. Brittenhouse. In both of those cases, this Court found that because the Forest Service was failing to ensure viable populations of wildlife species, that it had violated the National Forest Management Act. And in both of those cases, this Court set aside those project decisions and granted summary judgment in favor of the Constitution. What about Lands Council v. McNair, the recent NVANC case? Yes, Your Honor. It is important to address the Lands Council v. McNair case on two different levels. First, on the substantive level, in the McNair case, the conservation group did not raise the issue that we're raising today. The main issue that the appellants are raising is that the Forest Service failed to monitor populations of indicator species. That was not a claim addressed at all in the McNair opinion. The McNair opinion didn't even deal with indicator wildlife species. It dealt with one sensitive species, and it didn't address the issue of failing to monitor populations. On the more procedural level, the importance of the McNair opinion is that it upheld this Court's You can only rely on a proxy-on-proxy methodology if there's two elements that are met. Essentially, it outlined a two-prong test for reliance on the proxy-on-proxy methodology. In this case, the Forest Service has failed to meet either one of those prongs. The first prong set forth in the McNair opinion was that in order to rely on proxy-on-proxy, the Forest Service must first have a reasonably reliable and accurate knowledge of the quantity of habitat necessary to ensure a viable population. The Forest Service fails that prong in this case because their own scientists admit that they don't know how much old-growth habitat is necessary. Additionally, the Forest Service fails the second prong of the McNair test, and that second prong requires the Forest Service use a reasonably reliable and accurate method of measuring habitat. And so the Forest Service has also failed that prong in this case because, as indicated under the facts of this record, when the Forest Service went to verify its method of measuring old-growth habitat, it found that it had an 85% error rate. It was 85% wrong. And a scientific method with an 85% error rate is not a reasonably reliable method for measuring habitat. And so under both of those prongs of the McNair opinion, the Forest Service cannot rely on the proxy-on-proxy methodology. Additionally, this court set forth a third reason, a third circumstance, where the Forest Service can't rely on proxy-on-proxy in the Idaho Sporting Congress v. Rittenhouse case. And in that case, the court said, where the Forest Service is failing to meet its Forest Plan old-growth standard, then it's also violating NFMA by failing to ensure viability. And so we also have that third circumstance in this case where the Forest Plan requires 5% old-growth in every major drainage. And in this project area, four of the five major drainages do not have 5% old-growth. So the Forest Service is also failing its old-growth standard in this case. So under Idaho Sporting Congress v. Rittenhouse, that gives this court a third reason to invalidate the proxy-on-proxy methodology. Any one of those three is sufficient. And in this case, we have all three. So the Forest Service can't rely on that proxy-on-proxy methodology to ensure species viability. Instead, it must, as the plain language of its Forest Plan states, populations of wildlife indicator species will be monitored. And it hasn't done that, and that has presented serious problems for this forest. The Forest Service-owned scientists noted in the five-year review of the Forest Plan that because the Forest Service hadn't done that monitoring, they said the determination of population viability is near impossible. And so they felt that it was nearly impossible, the Forest Service-owned scientists, to determine if they were ensuring viability because they didn't have the baseline data necessary. And the Forest Service's sister agency in Montana, the Montana Fish, Wildlife, and Parks, also echoed that sentiment and even took it a step further and said the lack of monitoring data makes it impossible. So we have both of the wildlife agencies saying we don't know if we're ensuring viability because we just don't have any of that data. The second issue that I'd like to address is the divide landscape analysis. This project incorporated the divide landscape analysis and said that it was designed around that management guidance, that it was intended to recreate the conditions that the divide landscape analysis laid out, and that the divide landscape analysis was the document that provided the rationale for the purpose and need and design for this project. The Forest Service's reliance on that divide landscape analysis is a violation of NEPA because under NEPA you cannot tier a site-specific document to a programmatic document or a policy document unless that programmatic document has undergone a NEPA analysis. And that's exactly what the Forest Service did in this case. It said the recommendations and management guidance of that bigger document, the divide landscape analysis, provides the purpose for this project. Why isn't this just an internal research document which can be incorporated by reference? Your Honor, because the regulations, the CEQ regulations implementing NEPA require that policy documents or programmatic guidance documents have a NEPA analysis. And so this isn't like a scientific paper with hypothetical conditions or a scientific study. This is actually a management document where the Forest Service says, this is what we want the Helena National Forest to look like. Here's the standards that we need to change. Here's the log-in prescriptions that we need to do. This is a management document, not just a scientific paper. And the divide landscape analysis itself discusses the fact that in order to implement that document, it would need to amend its own forest plan. It recognized that there was conflicts between those two management documents, and then it would need to amend the forest plan in order to implement the divide landscape analysis without violating the forest plan. And just as a concrete example of one of those conflicts, the forest plan lays out the forest and says there's all these different management areas, and each different management area has a different prescription for wildlife preservation, logging, grazing, all the different management activities. The divide landscape analysis gives one broad generic prescription that basically says, it basically prescribes thousands of acres of logging to reduce the density of the forest across the board. There aren't site-specific management recommendations. And so for this project, in the FEIS for the project, the Forest Service said that they would be logging in eight different management areas. And the forest plan says five of those management areas are unsuitable for timber management. And so that's a concrete example of where the mandatory language of the forest plan, which is enforceable under NIFMA, is conflicting with the broad prescriptive language of the divide landscape analysis. And so in addition to that NEPA violation of tiering to a non-NEPA document, it's also a NIFMA violation because NIFMA requires the Forest Service manage the forest as prescribed in the Helena Forest Plan. And in this case, if it's implementing the divide landscape analysis, it's not following all the requirements of the forest plan. And on one more point, the divide landscape analysis also specifically says that it was not designed to achieve viable populations of wildlife. And because that's a requirement in the Helena Forest Plan, that failure to achieve viable populations in the divide landscape analysis violates the forest plan. The third issue that I'd like to address is the five-year review of the forest plan and why the Forest Service's conduct violated both NEPA and NIFMA. The statutory language of NIFMA requires that the Forest Service involve the public in the review of the forest plan. And this forest plan itself requires that there's a five-year review conducted every five years. And so in this case, the Forest Service conducted a five-year review, and the record indicates with over 100 documents leading up to the draft five-year review that it fully intended to publish that document and send it out to the public and amend the forest plan in accordance with the recommendations of the scientists in that document. That never happened. It was never published. A final document was never put out to the public, and the Forest Service never addressed any of the concerns that were... What provision exactly are you relying on for the five-year publication? The forest plan is what requires the five-year review, and that's in the record at the excerpts of Record 144. And the statutory language of NIFMA is what requires public participation. It says... No, I'm specifically the five-year review. That's a forest plan requirement, yes. There's no statutory or regulatory provision that would apply? There was a regulatory provision under the previous National Forest Management Planning regulations that those planning regulations were incorporated verbatim into the forest plan, so that's where that requirement came from. So it was originally regulatory. Now it's just a forest plan requirement. It's just a recital in the plan. That's what you're relying on? Yes, and the forest plan, because it's a forest plan standard, that's enforceable as... A failure to comply with that forest plan standard is a violation of NIFMA. So that would be a violation of NIFMA not to follow that. The reason that their conduct regarding the five-year review also violated NEPA, that issue is controlled by this Court's opinion in Idaho Supporting Congress v. Rittenhouse that had a strikingly similar factual situation. In that case, the Forest Service's own scientists raised similar concerns in the five-year review for the Boise National Forest. The Forest Service never addressed those concerns, and this Court specifically said because you didn't address those concerns in the EIS for these timber sale projects, then that's a violation of NEPA because you're not addressing the concerns of your own scientists, and that's a parallel situation here. The Forest Service, their own scientists, came up with these concerns. They never addressed them directly, and then they didn't address them either in the EIS for this project. The final issue that I'd like to discuss is the Forest Service's failure to apply the best available science standard. Was this an issue that you raised in the district court? Yes, Your Honor. Where? The issue was raised in oral argument. The further excerpts of record at 402, 404, and 405 all indicate that it was discussed in oral argument. The magistrate requested supplemental briefing, I believe, on that issue, and then the magistrate addressed the issue and came to a conclusion in its findings. It's discussing the standard at ER 9 through 12, and one example at ER 28 is applying it to the Gossack, and so the lower court did address this. Even if the district court hadn't addressed this issue, the Tenth Circuit Case Ecology Center versus U.S. Forest Service still required the Forest Service to apply the best available science standard, even though it hadn't been raised at all in the district court and certainly not in the administrative court. Under our rules, though, if it wasn't raised and not preserved, regardless of how the Tenth Circuit would view that, don't we normally require an issue to be raised below before we'll consider it? Yes, Your Honor, and that's why it was sufficiently raised, because it was addressed in oral argument, and also the evidence of that was that the magistrate did issue specific findings on that issue. Additionally, as this Court recently recognized in Wild West v. Bull, it is appropriate to bring an issue for the first time on appeal if there's been a change in the law, and so nobody really knew how the Forest Service was interpreting its planning regulations because they were in and out of litigation and they kept revising them, and so the Tenth Circuit guidance on that was really the First Circuit precedent that indicated how the Forest Service was applying the planning regulations and applying that best available science. Is there a problem in that there was no reference in the complaint to this point? Well, no, Your Honor. Under the Tenth Circuit case, that wouldn't have been an issue. The other issue is that under Idaho Supporting Congress v. Rittenhouse, this Court stated that the plaintiffs or the conservation groups don't need to incant magic words. They have held that as long as the substance is raised, then that's sufficient to address an issue in litigation, and if I could, I'd like to reserve my remaining time for rebuttal. You may do so, Counsel. Thank you. We will hear now from the Governor. May it please the Court, my name is Alan Brabender, and I represent the United States Forest Service and the other Federal defendants. First, with regard to the viability issue, as you just heard, the plaintiffs speak in generalities, which is a big problem because viability and habitat analysis is done on a species-by-species basis. But plaintiffs do not bring a challenge to the Forest Service's analysis as to any particular species, which makes it very difficult to defend against their challenges. Here again today, they don't make any claim with regard to any particular species. Now, in the reply brief, they do seem concerned with the goshawk. So we can go through the analyses that the Forest Service used to assess the viability of goshawks, and I'm looking at Volume 3 of the Supplemental Excerpt of Record, which is the complete supplemental EIS. We turn first to page 482, I believe, in which the Forest Service is discussing the viability analysis with respect to the goshawk. And there you see the Forest Service applying the best available science, describes the quality of habitat that goshawks need. And they also cite the Reynolds Report that the plaintiffs are so fond of. We then turn the page to page 483, and there the Forest Service describes the quantity of habitat that goshawks need. Again, applying the best available science, including the Reynolds Report. The Forest Service then goes on to conclude that the Clancy-Unionville project area could theoretically support 10 goshawk home ranges, that their field observations indicate that 6 out of the 10 ranges have been occupied by goshawks. It then goes on to say that maps of habitat, as well as continuing field surveys, show that the Forest Service is, in fact, supporting a viable population of goshawks. We turn the page to page 44. It shows the different types of data the Forest Service used to make this assessment, which includes both habitat analysis as well as population monitoring. And it indicates the types of habitat data and population monitoring that it does for each individual management indicator species. We then turn to page 487. Page 487 then rates the probability of persistence for the northern goshawk over the next 50 to 100 years to be high. We then turn to page 501 of the supplemental excerpts of record. There the Forest Service is analyzing the effect of each alternative in the EIS on goshawks, and it states that after timber harvest, suitable habitat will remain, and that timber harvest would not displace resident goshawks under any alternative. And we can confirm this by turning to page 556, which analyzes the project's impacts on goshawks with respect to Alternative F, the alternative chosen. And it concludes that Alternative F would comply with the guidelines applicable to the northern goshawk. Now, this is exactly the same analysis that this court approved in the Native Ecosystems which we cite in our brief and which the district court also relied on. And it should really be no surprise then that this is the same because the Jimtown Project at issue in that case was done by the Helena National Forest, the exact same forest that is doing the Plancy Unionville Project and used very similar methodology. So I think the Native Ecosystems case is very persuasive and should be helpful to this court. In the end, the record contains hundreds of documents of monitoring for the goshawk. As we state in our brief, this record is 22,000 pages. And while not all the goshawk monitoring is in the supplemental excerpt of the record, there's quite a bit of it in there. And this court can turn to the index and see the notes of the monitoring at DD of the index. And all of it indicates that the Forest Service is maintaining viable populations of goshawks in this forest. And, in fact, we could go through this analysis with respect to every other species. And the Forest Service has, I think, determined quite logically that every species in this forest is viable. Now, turning to this argument with regard to the divide landscape analysis, the Forest Service is not tiering to the divide landscape analysis. It is simply incorporating it by reference, as it does with numerous scientific reports. What's the difference? When you're tiering to a document, you are using that document to further your NEPA analysis. And you do this to cut down on the bulk of the EIS. So, for instance, you're just referring to when you're tiering, it's a form of incorporation. You're incorporating things that have been previously aired and open for notice and comment and so forth. You're using it to further your analysis of environmental effects, which is really the heart of NEPA. And for that reason, the court has said that you can only tier to other NEPA documents. But when you're incorporating something by reference, you're doing it for some other reason. For instance, the divide landscape analysis was incorporated to further explain the purpose and need of this project. I have a problem with the semantics of this, because it can't be true that you just get to pick a label, and that creates a legal result just by picking a label and saying, well, we've decided to call it incorporating and not tiering, so we win. What is it about the characteristics of a given document that permit it to be incorporated, even though it has not independently undergone a NEPA-style review? Clearly it can be a list, you know, attached as a list of something or another that we're going to include here. But there's more analysis to this one. This is not just a laundry list, for example. What is it about a document that allows it to be incorporated substantively? Well, I would approach it from a different angle, Your Honor. When you're tiering to something, you're using it to further your NEPA analysis. And so I would look at it from the perspective of this particular EIS, the EIS for the Plants and Union Bill project. And the question should be whether or not the Forest Services analysis in here can stand alone on its own without turning to the Divide Landscape analysis. And it can. If it was tiered to it, you'd have to look at both documents. It's not a matter of has to. It's chosen to. I mean, that could be said of any document, even a document that it's tiered to. And presumably everything that's included is supposed to be forwarding the analysis, or it wouldn't be there. So, I mean, in a way, your definition would make almost everything tiered in the sense that it forwards the analysis. No, well, it's the environmental analysis again. I think that might be the distinction. The Forest Service was not relying on the Divide Landscape analysis to further its environmental analysis, to further its analysis of the environmental effects of this project. It was incorporating it to further the purpose and need of the project. But, you know, again, I think it's difficult for me to answer your questions, Your Honor, because, you know, the plaintiffs never really explained their argument in their opening brief. This has nothing to do with what their explanation is. It has to do with my uncertainty as to what the difference is between tiering, which you can't do, and incorporating by reference, which you can, which stems from our own cases. So it isn't really – it's not really so much a question about the plaintiff's argument as it is about that concept and how to parse the concept. Well, Your Honor, again, I think tiering, when you're tiering through a document, you're using it to further your environmental analysis, which is not – When you're tiering through a document, you are – it's a form of incorporating by reference. Yes, I think that's right. Something that's previously been done. Right. And presumably something that the Forest Service thinks has previously been settled. If you're incorporating something by reference, does that mean that it's still open for notice and comment, that the agency still has an obligation to defend it and explain it? I think that's probably right. You could incorporate by reference the Oxford English Dictionary. That's right. And nobody – presumably nobody would dispute the authority of that, even if you hadn't previously cited it. But if you previously had conducted a full field study on some animal, let's take your goshawk example, and the agency then might wish to say, look, we're not going to repeat all of that analysis because it's previously been aired and we simply incorporate it here and it's called tiering. Right. But the goshawk would have been subject to notice and comment and the agency's responsibility to justify it. Right. So when you adopted the divided landscape analysis, did the agency have an obligation then to defend that analysis, including internal documents that were now made a part of this record? I think it did. Yes. In this – with respect to this project. So by incorporating it by reference, it's simply a shorthand for the agency, but it doesn't absolve the agency of the obligation of defending the analysis in the document. I believe that would be a good way to look at it. So what's our problem here? I don't know what the problem is, Your Honor. There should be none. You know, I guess then under your theory, the plaintiff should challenge the divided landscape analysis, what they believe is wrong with it. And if there is a problem with it that makes their approval of this project arbitrary and capricious, this Court could then find different reasons. It seems to me that simply incorporating it by reference doesn't make it wrong. And I don't think it makes it procedurally infirm. It makes it subject to attack. And if we don't have the attack, then we don't know what the problem is. I think that's right. I think that's right. Now, with regard to the five-year review, again, to the extent we can understand what the plaintiff's arguments are, there are several problems with it. First, this lawsuit was filed in 2004, and thus the six-year statute of limitations would apply to any challenge to something that occurred in 1994. Second, the Forest Service's actions with regard to the 1994 review are not cognizable under the APA because they're not final agency action, as that term is defined by APA Section 551 or the Supreme Court's decision in Bennett v. Speer. It is not an order. It is not a license. It is not a relief. Sotomayor, counsel tells us that it's in the plan. That's what she's relying on. There is a requirement to do a review in the plan, and the Forest Service conducted their review. There is no – again, to the extent we can understand what their challenge is, they seem to be arguing that the Forest Service should have published that review. There is no requirement in the plan to publish the review, simply to do it. And there is no requirement whatsoever that plaintiffs can point to that says the Forest Service must publish every document, every study, every piece of paper that it produces. There is simply just no requirement out there. If the plaintiffs want a document, such as the five-year review, they can make a request under the Freedom of Information Act, which they did in 1999, and the Forest Service provided the document to them. So the Forest Service has complied with all public participation requirements with regard to the 1994 five-year review. And finally, Your Honor, with regard to the best available science argument, it is our position that this claim has been waived or forfeited. Let me ask you to respond specifically to counsel's argument that this was a matter discussed with the district court and as to which the district court eventually made findings. And I presume to tease that out, the point of the requirement to preserve an argument is to give the district court the first opportunity to rule on an issue. And if a subject was discussed and ruled upon, even if not formally in the complaint, why isn't that good enough? Well, actually the plaintiffs made the opposite argument to the district court, that the 2000 transitional regulation did not apply and that the repealed 1982 regulations applied. It was the government that argued that no, the 2000 transitional regulation applied. And so the Forest Service then had to resolve or, I'm sorry, the district court then had to resolve that dispute. So plaintiffs made the opposite argument in the district court and are now doing an argument with regard to the best available science here on appeal. And Judge O'Scanlan is right. There is no real basis in the complaint for this argument. But it isn't because it isn't in the complaint. It sounds like your argument is really based on a change of position, which is different than whether it's technically in the complaint or not in the complaint. Well, I think there's two arguments. First, it's not in the complaint. And second, they didn't make the argument in the district court. In fact, they made the exact opposite argument. Okay. But I understand your argument, but if an argument, if they had made the same argument orally to the district court and had it ruled upon as they are now making today, why wouldn't that be sufficient to preserve it for our consideration? Well, because I think they have a duty to make, they did not make the argument. They made the opposite argument. I understand that. I understand that. I'm trying to distinguish between your position on whether something absolutely has to be in the complaint in order to be preserved or whether simply presenting it in some other form to be ruled upon by the district court and, in fact, being ruled upon is sufficient. You know, Your Honor, I don't know whether or not, I don't know this Court's case law with regard to whether or not it has to be in the complaint. I'm sure there are cases out there. But that actually brings me to another point, which is, in our brief, we argued that because they didn't exhaust their administrative remedies, that this Court lacked jurisdiction to consider their argument. And as I was researching this last night, I came across a case, which I will provide this Court later, but I will mention it now, McBride-Cotton v. Cattlecourt v. Venneman, in which this Court said that a failure to exhaust the USDA Reorganization Act is not jurisdictional. And so our statement in our brief would be wrong. There is, in fact, a circuit split on that issue. This Court is on the side that the requirement is not jurisdictional. However, it still strictly applies the waiver requirements, and you can see that in the McBride discussion. And finally, with regard to the best available science, even if this Court does consider it, I think the record shows that the Forest Service did, in fact, consider everything that plaintiffs believed to be the best available science. It considered Reynolds-Dungas-Hawk. It considered the Northern Region SNAG protocol. And it considered the vegetation management regimes from various scientific documents for continental climactic forests. And if this Court has no further questions. No questions, Counsel. Thank you. Okay, thank you. Ms. Smith, you have some reserved time. First, I'd like to address the Forest Service's argument that the appellants have not notified them which wildlife species they're concerned about. The Table of Contents of Appellants' Opening Brief cites six specific wildlife species. Four of them are management indicator species. The goshawk, the hairy woodpecker, the pileated woodpecker, and the pine marten. Those are specific wildlife species, management indicator species, whose population the Forest Service has failed to monitor. Second, regarding the Forest Service's citation to Native Ecosystems Council versus U.S. Forest Service, the Jimtown Project, that case addressed one goshawk nest. It didn't address a claim of failure to monitor populations of indicator species. It didn't address any other species besides the goshawk. And in that case, the record was different because there was nothing in the record to demonstrate a flaw in the proxy-on-proxy methodology. The five-year review was not in that record. There was no 85% error rate identifying habitat in that record, and the Forest Service wasn't failing to meet its own Forest Plan old-growth standard in that record. Those are the three facts which render proxy-on-proxy invalid in this case, and none of those facts were present in the Jimtown case, and so the court never reached the final issue of whether the Forest Service had failed to monitor populations of indicator species because they found that instead it could rely on that proxy-on-proxy. Third, the definition of tiering in the CEQ regulation specifically says that it applies to programs, plans, and policy documents, and so that's the distinction between, for example, incorporating, by reference, the Oxford English Dictionary or a scientific document. Tiering is about a program, a plan, or a policy document that provides guidance, management guidance. Ordinarily the kinds of things that would be subject to notice and comment proceedings. Exactly. Okay. So the document that's at issue here is what? The divide landscape analysis. Okay. And it was a what? It's a programmatic document that sets forth the desired future conditions of the Helena National Forest, and it specifically sets forth habitat standards, elk habitat standards. Does that mean that it cannot be incorporated at all just as a matter of agency efficiency? We can't say, look, we're going to adopt this. Please feel free to comment and send all of your – we're giving you notice now that we're going to do this, and please send all of your comments if you disagree with this. But here's where the document is. It's on our website at – let me give you a citation. What would be wrong with that? Well, under the Kern versus BLM case, there is nothing wrong with that as long as that document went through a NEPA analysis. That's the whole point of tiering is that the Forest Service can do that, but before they can do that, there must be a NEPA analysis for that individual document. But what if it's part of an ongoing NEPA analysis? The NEPA analysis here seems to have been taking place in stages. And so we have a difference between the preliminary reports and final reports and subsequent reports and so forth. If at some point the divided land analysis is simply incorporated by reference into a document, and that document is part of an ongoing process under NEPA, what would be wrong with that? Well, the problem is that you would need a final decision regarding the divided landscape analysis, and that's normally something that would be separate from the site-specific. So what's the problem here? I'm still having a difficult time. I understand that you don't like something about the divided land analysis. I'm having a very difficult time understanding what the problem is. The problem is that it sets forth specific management recommendations for the NLF that conflict with the recommendations and standards in the Forest Plan, and that if the Forest Service wants to change its management regime and implement the divided landscape analysis instead of the Forest Plan, then it needs to lay out all of the recommendations, submit them to the public, allow public notice and comment, and come to a final decision that says, we hereby now decide that we want to implement divided landscape analysis, so we're amending it into our Forest Plan as specific habitat standards. Your specific objection to the divided land analysis is that it was never subjected to notice and comment and had a final decision, agency decision. That's correct, and the divided landscape analysis itself states that the Forest Service intended to do that process. It intended to come to a final decision for each analysis and then take that and amend it into the Forest Plan through the normal NEPA process, and then that would then be the binding management standards for the forest. Mr. Bravener suggests that that is still open to you. That the NEPA analysis for the divided landscape? Well, a challenge specifically based on public participation. In other words, the public still has an opportunity in this process. Is he mistaken or not? Well, I believe at the appropriate time under the U.S. Supreme Court precedent in Ohio forestry, the only time that a conservation group can challenge something like forest plan implementation is through a site-specific project, and so that's why this challenge is being brought now, is because the conservation groups can't challenge the divided landscape analysis on its own. They have to challenge it through the implementation of a timber sale project, and so that's why that challenge is being brought now, and that's why they are requesting now that that go through the NEPA analysis, because there really is no other time. Just the constraints of the law are that there is no other time for us to bring a challenge like this. I just want to make... Counsel, your time has expired. Thank you very much. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Graber, Bybee